## Winter *vs* Wheeler.

APPEAL FROM THE BOURBON CIRCUIT.

*Practice in chancery.  Interrogatories.*

CHIEF JUSTICE EWING delivered the opinion of the Court.

CHANCERY.

Case 9.

September 18.

Case stated.

WHEELER was taken into the retail store of Winter, in July, 1817, as his principal salesman and book keeper, and was continued in said service, with the occasional assistance of Winter and others, subordinates, for some nineteen years.  In 1832, Winter surrendered to Wheeler and his son Charles, the store and the entire profits thereof, requiring of them only to contribute out of the same, so much as was necessary to support his family.  In the fall of 1835, Winter suddenly broke up the association and terminated the business, requiring the goods on hand to be sold at whatever they would command.  Wheeler continued until 1837, settling up the business, when the books, papers and remnant of goods on hand, were delivered over to Winter, and receipts passed, in which Winter "acknowledged the receipt of $1,000 from Wheeler, which is a balance in full of all demands standing against him on his books, since July, 1817, to this date."  After an angry contest in the Federal Court, in which Winter set up and asserted an old debt against Wheeler, which originated before he entered the service of Winter, and which Winter had purchased, and sought to subject to its payment the goods in a small store, which Wheeler, by the aid of friends, had established for his support, after he left the service of Winter, and which Wheeler had mortgaged to secure other more innocent and meritorious creditors, in which proceeding Winter had failed, this bill was filed in June, 1842, charging Winter with the embezzlement of his funds, while engaged in his service as his principal factor and book keeper, to the enormous sum of upwards of $70,000.  The answer of Wheeler unequivocally denies the charges, and upon the hearing the Chancellor dismissed the bill and Winter has appealed to this Court.

We have examined the heavy record in this case, with great care and attention, and judging charitably, we must say that the facts relied on by the complainant, are scarcely sufficient to authorize a plausible suspicion of guilt, much less a well grounded presumption, which would authorize a decree against the defendant, upon charges so serious as those exhibited. It would seem to be passing strange and wholly incredible, that Wheeler could have been guilty of the enormous embezzlement charged, and had retained, through so many years, the entire confidence of Winter, who had a constant eye over, and the general superintendence of the concern, except when absent in the east making purchases, and who was well qualified as a practical merchant and intelligent and astute man, to discover and detect any defalcation in the management of the establishment by Wheeler. And if the enormous amount charged has been fraudulently abstracted, to what purpose has it been applied by Wheeler? Where are the accumulated gains, the immense fortune? Or how has it been squandered? It has not been shown in the proof. But so far from it, it appears that Wheeler, after spending the prime of his life, in the service of Winter, is still poor and strugling for a bare support.

Evidence and circumstances from which the Court conclude that the charge of embezzlement is not supported by the evidence in the case.

There is no foundation for the suspicion that the change in the mode of keeping the books, by the adoption and use of a memorandum book, was resorted to by Wheeler the better to enable him to cover over and conceal his embezzlement as charged. Other well conducted establishments use memorandum books in the same manner and for the like purpose, as those used by Wheeler. Besides, it was well known to Winter that they were used, and the use of them never countermanded, nor any suspicion entertained that they were used for the fraudulent purpose now charged, until it became necessary to make out a case, and then for the first time, after the lapse of near twenty five years from the change, the use of them is siezed upon as evidence of a fraudulent purpose and intent.

And if the data of forty five per cent. gross profit upon the whole amount of the original costs of purchase, was correct, and all that the real profits fall short of the amount

produced by the estimate, was in fact shown to have been abstracted, it would fall very far short of proving upon Wheeler the guilt of the abstraction. Winter himself was in the store frequently, superintending and aiding in the sales, and making entries in the books, so also were others, and the imputation might as well fall upon them, or some of them, as upon Wheeler. But the assumed data upon which the estimate is made, as well as the result, is as fallacious and deceptive as the data and estimate of profits made on paper by a sanguine man, upon entering on some untried enterprise. The data upon which the estimate is made, is obtained by ascertaining the advance upon costs of sales made for certain short periods selected, it may be, and pointed out by Winter to Bell, his private Commissioner, in the absence of Wheeler, and exhibited in his report. The profits or per cent. made upon such selected sales is an uncertain and deceptive criterion of the profits or per cent. made upon the entire sales of the whole period. For one week a merchant, by the sale of fancy articles or others, that happen to bear a high per cent. may make double the gross profits that he may make the next week, by the sale of as many goods in value, but which bear a less per cent. upon costs. Besides, no allowance is made or can be made for trimmings thrown in, or remnants or unsaleable goods, or goods that go out of fashion, and which cannot, in some instances, be sold at all, and in others can be sold only for cost or for costs and carriage, or a small per cent. above it. Besides, there are many articles that are received in barter, upon which no per cent. is made. Again, it appears that the store of Winter was commenced by the purchase of an old stock of goods upon disadvantageous terms, upon which it may be presumed that but little profit was made, as some of the articles remained on hand during the continuance of the concern. And the establishment was suddenly broken up by Winter, and the goods on hand, to a large amount, sold for costs and less than costs, which would subtract largely from the aggregate of profits.

Again, it is shown by the evidence of merchants, that about two or three failed in business, to one that succeed-

ed, during the same period.  And among those that succeeded best, some of them purchased for cash, while Winter traded mainly upon borrowed capital, having exhausted his original capital in the purchase of a dwelling and Ware house, their profits varied only from twelve to twenty five per cent.  And by a full estimate of profits from 1817 to 1820, during which period Winter attended more closely to the minutia and details of business in the concern, the profits exceeded only a fraction over twenty per cent. upon the costs.  Besides, it appears that the profits of Winter exceeded the average profits made by other successful merchants at the same place, during the greater portion of the same period.  Nor does the want of correspondence in amount of receipts entered on certain specified days, with the charges entered on the cash book, justify the presumption that the excess of the receipts over the entry in the cash book, was abstracted. In some of the items selected as specific acts of fraud, a full and satisfactory explanation is given by the evidence of living witnesses, the rest may be susceptible of explanation in the same way, and should be ascribed to mistake in the day of the entry, or to a distribution of the fund received among several days, or to a receipt in articles of barter, or to a receipt by offsetting a demand against the store, against a demand in its favor, when in fact no cash was paid, or if paid, was paid in a check or order, and not charged on the cash book till the money was received.  By any of these ways the apparent discrepancy may have reasonably occurred, and should be presumed to have occurred, rather than to indulge in the uncharitable imputation of embezzlement, against a man who, for a series of years, has sustained the character of an *honest man*, and secured the confidence of his neighbors, as well as that of Winter himself, as a man of faithfulness, integrity and honor.  We will not stop to enumerate and discuss the other numerous grounds relied on by Winter to sustain his charges, they are all equally, and in fact more futile than those commented on.  Suffice it to say, that we are entirely satisfied that the Chancellor below properly dismissed the complainants bill with costs.

But a question of practice as to the mode of interrogating the parties by the master in chancery, is urged upon the consideration and determination of this Court, though its settlement, the one way or the other, can in no wise affect or change the result in this case. The question is, shall a party to a suit, when examined by the master in chancery, be examined *viva voce*, or shall he have the right to require that the interrogatories shall be made out and furnished to him in writing, before he is required to answer.

It is believed to be the general, and perhaps the universal practice in this State, to examine the *parties* as well as witnesses, *viva voce*, writing down each interrogatory at the time, except in the cases pending in the Louisville Chancery Court, in which Court, by the rules of the former Chancellor, written interrogatories and cross interrogatories are required to be filed, and answers only to those interrogatories given. There has been no question heretofore raised in this Court, that we are aware of, as to the propriety of the *viva voce* examination of *parties* or *witnesses*, adopted and pursued in this State. And as justly remarked by the learned Chanceller, who decided this case, it is better calculated to search the conscience and elicit the truth, we should not feel now at liberty to change the practice as to witnesses, who, even in England, are sometimes examined by the master *viva voce*: (*Smith's Chancery Practice*, 147–8,) though never by the examiner or commissioner empowered to take their depositions. In the case of witnesses, if entangled or entrapped by an ingenious examiner, and made to speak what is untrue, they may be made to explain by a cross examination. But in the case of *parties* examined before the master, they have no such opportunity afforded them, and may, if ignorant and unacquainted with the force of language, be examined and entrapped by a wiley and cunning antagonist, into unintentional contradictions and admissions variant from the truth, which may expose them to a prosecution for perjury. And though as to the parties, if they submit to a *viva voce* examination, no objection can be made to the course pursued by the master, and the more especially, as it is unquestionably the better

WINTER
*vs*
WHEELER.

Shall a party interrogated by his adversary before a master in chancery have the right to demand that the questions be propounded in writing? Held that such was the practice in England, and such is the correct practice here, otherwise as to witnesses.

<div style="margin-left:0;">
WINTER
*vs*
WHEELER.
</div>

practice to search the conscience and extract the truth, unvarnished by the aid of counsel; yet it is unquestionably the English practice, for the counsel to prepare *written interrogatories*, which are submitted to the master for his approval, and when approved, are engrossed, and the original or a duplicate, handed over to the party to be examined, who being allowed reasonable time, returns his answer to the same, to which he is sworn; (*Smith's Chancery Practice from* 122 to 125, *and the authorities cited.*) If additional interrogatories are deemed essential, they may be prepared in like manner. But this being the English practice, from whence we derive our rules of jurisprudence, and the rule as to the examination of *parties* litigant, by prepared written interrogatories, approved by the master, being a rule necessary to secure a right and protect the party examined from an obvious injury to which he may be exposed by an oral examination, if he insists upon being examined by written interrogatories, prepared, approved and submitted beforehand, he has a right to demand it, and ought not to be deprived of the right.

Interrogatories to the parties litigant, are in the nature of interrogatories in a bill or answer, and are propounded for the like object, and the answers used to the like extent, and no other. They are substituted in the place of written interrogatories in a bill or answer, as the more convenient mode, especially in complicated account cases, to extract the truth from the parties where it may be confined to their own knowledge, and save the necessity of taking proof when it is not. As interrogatories are always propounded in writing in a bill or answer, so should they be before the master, if the party interrogated desire it. It was error therefore to the prejudice of Wheeler, to require him to submit to an oral examination, or in refusing him the right to have the interrogatories propounded approved by the master, and submitted for answer, as required by the English practice.

*Interrogatories to a party before the master, are in the nature of interrogatories in bill or answer in chancery, and the answers are evidence to the like extent ag'st the party making them.*

But, as heretofore intimated, the chancellor's decision was right upon the merits, and is therefore affirmed.

The appellant appeared and argued his own cause; *Robinson & Johnson* for appellee.